# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                          Criminal No. 11-00162 (SRN/JJK)

        Plaintiff,

    v.

Renee Marie Brown,                          **MEMORANDUM OPINION**
                                                                    **AND ORDER**
        Defendant.

---

Kimberly A. Svendsen and Kimberly M. Hare, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Plaintiff.

Paul C. Engh, Paul Engh Law Office, 220 South Sixth Street, Suite 215, Minneapolis, MN 55402, for Defendant.

---

SUSAN RICHARD NELSON, United States District Court Judge

      Defendant Renee M. Brown pled guilty to wire fraud in violation of 18 U.S.C. § 1343.  The parties disagree about the loss amount Defendant caused—a factor relevant in determining the sentence recommended by the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines").  The Government calculates the loss amount at $1,100,000, while the Defendant suggests it is zero.  The Government also seeks a two-level enhancement to the Defendant's Sentencing Guideline calculation because the offense involved sophisticated means, a two-level enhancement because she directed the offense at vulnerable victims, a two-level enhancement for obstruction of justice, and no reduction for acceptance of responsibility.

For the reasons stated below, the Court determines that Defendant's loss amount is over $1,000,000 but less than $2,500,000. The Court also finds that the Presentence Investigation Report ("PSR") properly did not give her a two-level enhancement for sophisticated means, a two-level enhancement for vulnerable victims, and a two-level enhancement for obstruction of justice, and that Defendant is entitled to a three-level reduction for acceptance of responsibility.

## I.  BACKGROUND

### A.  Defendant Sought Investors For A Fixed Income or Bond Fund

Defendant was a founding partner at Wildwood Wealth Management ("Wildwood"), and worked there as a financial advisor and an investment manager of client funds from 2000 to 2010. (PSR ¶ 6.) In June 2009, Defendant began soliciting Wildwood clients to invest in a fixed income or bond fund with an eight or nine percent rate of return. (Government Exhibits ("Gov't Exs.") 10–11.)

She first e-mailed her client, H.J., to invest "$100K" in what she described as an investment that yielded "9% annualized fixed income (three year maturity pays the dividend quarterly)." (Gov't Ex. 10.)[1] H.J. told Defendant that she was reluctant to take

---

[1]     Defendant claims that the Court should not consider H.J. a victim for sentencing purposes because H.J. was not listed in the indictment and H.J. has expressed her support for Defendant to the Probation Office. (Cf. Doc. No. 1; PSR ¶ 37.) Relevant conduct under the guidelines need not be charged to be considered in sentencing, and it includes all acts and omissions "that were part of the same course of conduct or common scheme or plan as the offense of conviction." USSG § 1B1.3(a)(2). Offenses are part of the same scheme or plan when they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." Id. § 1B1.3, cmt. n.9(A). Offenses are part of "the same course of conduct" when they are part of an "ongoing series of offenses," a determination

on additional debt because she was remodeling her home.  (Id.)  Defendant responded,

"Here's my compromise.  Do the 9% fixed income portion for $100,000.  Leave the rest

in cash until you finish the house."  (Id.)  H.J. chose not to invest at this time.  (Cf. id.;

Gov't Ex. 1.)

Defendant also emailed another client S.H. and made the following suggestion:

The FDIC as you are aware is taking over smaller banks.  20They [sic] are
stripping and repacking the mortgage pools and selling them to private
equity firms.  This is secured by first mortgages and is being bought at
aprox [sic] 30 - 35 cents on the dollar.  In order to bid on the portfolio, the
private equity firms have to have $100M in cash, ready to go and have to
close within 3 days.  So, the payment stream is being purchased at a
significant discount.  The portfolio has an average maturity of 20 years
and20this [sic] is anticipated to be a 3-5 year hold and it will be sold again.
The equity firm makes their money on the back end when they resell the
portfolio.

I've talked with the firm and they will let us put some of our investors into
the portfolio to fill out the fixed income portion of their holdings.  This
pays a 9% annual coupon, quarterly payments, 3 year hold from entry as
long as the entry happens in 2009.  Return of principal at expiration of three
years.  No dividend reinvestment.  No early out.  No death put.  Really
simple structure.  Reg. D offering which means only accredited investors
can participate.

I put $200K in it to cover Madeline's tuition for the next three years.

(Gov't Ex. 11.)  The Defendant told S.H. that, "the fixed income is an incredible

opportunity.  It's a total result of the Government bailou t [sic] and the real estate crash,

so to the extent we can benefit, I'm encouraging folks to do so."  (Id.)  Defendant

suggested that S.H. "move 100K into this offering."  (Id.)  S.H. agreed and signed a

---

that turns on the similarity, regularity, and time interval of the offenses.  Id. § 1B1.3, cmt.
n.9(B).  The Defendant solicited funds from H.J. as part of the same scheme and the
Court will therefore consider H.J.'s investments as relevant conduct.

Private Placement Investment Memorandum ("PPM") and subscription agreement to invest in Fund X. (Defendant's Exhibit ("Def. Ex.") 10.)[2]

## B.  Defendant Created Income Investors Fund X

After seeking potential investors, Defendant created Fund X under South Dakota law on July 1, 2009. (Gov't Ex. 14; PSR ¶ 6.) Fund X had the same mailing address as the Defendant's home and Defendant was the sole managing member. (PSR ¶ 6.) Defendant described the fund to her accountant for tax purposes as "simply an LLC . . . [i]t's NOT a mutual fund. It's not even a security. It is a South Dakota LLC." (Gov't Ex. 14.)

Defendant opened a bank account for Fund X at TD Ameritrade on July 1, 2009. (Gov't Ex. 4.) She was the only authorized agent on the account and she used her home address as the mailing address. (Id.) On the application form, Defendant indicated that the Fund X account would be used for "portfolio management." (Id.) After the application had been submitted, TD Ameritrade e-mailed Defendant requesting information about the members of Fund X. (Gov't Ex. 5.) Defendant responded, "Attached is the unit subscription agreement for the account. You will note the two

_____

[2]     At the evidentiary hearing, Federal Bureau of Investigations ("FBI") Special Agent Ruth Hovey testified that she had asked S.H. about signing the PPM at her interview. S.H. told Hovey that she had signed a copy of the PPM, but she no longer had it in her possession. Defendant submitted a sample PPM as an exemplar of the PPM S.H. may have signed, but she did not provide a PPM signed by S.H. (Cf. Def. Ex. 1.) Defendant's counsel admitted that different versions of the PPM existed and the Government submitted a different version of the PPM that had been given to the Securities and Exchange Commission ("SEC"). (Gov't Ex. 65.) Since Defendant has not verified whether S.H. received or signed the PPM produced at the evidentiary hearing, the Court will not consider its terms.

members are the Renee Brown Agency and Renee Brown as an individual. You have the complete paperwork for the Renee Brown Agency . . . and will note that I am the sole member of that account." (Id.) When TD Ameritrade inquired whether Fund X was a hedge fund, Defendant responded, "It is NOT a hedge fund. It is my personal account – just has a funny name." (Id.; PSR ¶ 7.)

### C. Defendant Created a Second Fund X Account at Wells Fargo Bank

On July 7, 2009, Defendant requested a wire transfer of $100,000 from S.H's Wildwood account at Charles Schwab to the Fund X account at TD Ameritrade. (Gov't Ex. 1; PSR ¶ 9.) Following the transfer, Defendant attempted to wire $10,000 from the Fund X account at TD Ameritrade to her personal checking account at USAA Federal Savings Bank ("USAA"). (Id.)

On July 13, 2009, TD Ameritrade informed Defendant that it "discourages our clients from using their accounts primarily as 'pass-through' accounts to facilitate the transfer of funds between bank accounts." (Gov't Ex. 7.) TD Ameritrade stated, "[e]ffective [i]mmediately, funds that have not been used for investment purposes can only be transferred back to the bank account of origin." (Id.) Defendant responded, "This is account [sic] is solely owned by myself, an individual, even though it is titled as an LLC. . . . I fully intend to make gifts and transfers from this account to non-similarly titled accounts via wire and ACH transfer. Please advise how this can be done. If you are unable to accomplish these types of simple wire transactions, please advise as well so I can move my account to a different platform." (Id.)

Defendant escalated the issue to the office of the president and general counsel of TD Ameritrade after TD Ameritrade informed her that it would not permit her to make the transfer. (Gov't Ex. 8.) Defendant's email stated:

> I am trying to wire $10,000 from an account that I have sole control over in order to fund an escrow account to purchase Real Estate. The accounts are not similarly titled. This is not a money laundering scheme nor is it a violation of the Patriot Act. This account was recently opened to purchase investments and, in fact a buy order GTC entered. IN [sic] addition to traditional investments, the Investors Income Fund intends to purchase distressed debt outside of the TDAmeritrade [sic] platform. I expect this account to have a balance of $2M by the end of the year funded from different sources.

(Id.) Despite Defendant's personal e-mail, TD Ameritrade's compliance department denied Defendant's request to wire funds to her personal checking account at USAA. (Cf. id.)

After Defendant understood that she would not be able to wire the funds she desired through TD Ameritrade, she opened a second Fund X account at Wells Fargo Bank ("Wells Fargo") and listed the fund's industry as "Management of Companies and Enterprises." (Gov't Ex. 9.) Defendant put her home address for Fund X's address and named herself as the only authorized signatory on the account. (Id.) Defendant then wired $50,000 from the TD Ameritrade account back to S.H.'s Charles Schwab account, (Gov't Ex. 1; PSR ¶ 10), and then transferred that money to the Fund X account at Wells Fargo. (Id.) Defendant subsequently made two transfers totaling $24,000 from the Wells Fargo Fund X account to her personal USAA checking account and Wells Fargo savings account. (Gov't Ex. 1; PSR ¶ 10.)

**D.    Defendant Continued to Solicit Funds From Investors and Used Fund X Money to Pay Her Personal Debt**

In August 2009, H.J. authorized Defendant to transfer $100,000 from her Wildwood account at Charles Schwab to the Fund X account.  (Gov't Ex. 1; PSR ¶ 10.) Defendant transferred $50,000 to the Fund X account at TD Ameritrade and $50,000 to the Fund X account at Wells Fargo.  (Id.)  Defendant then transferred $22,000 from the Wells Fargo Fund X Account to her Wells Fargo savings account.  (Id.)  Some of the money transferred to Defendant's personal bank accounts was used to pay her personal debt.  Specifically, on August 19, 2009 she transferred $6,500 from the Wells Fargo Fund X account to a fellow Wildwood principal and his wife to repay a personal loan.  (Gov't Ex. 1.)

**E.    Defendant Loaned Money From Fund X to Sawtooth Asset Management in her Own Name**

In November 2009, Brad Pries of Sawtooth Asset Management ("Sawtooth") requested that Defendant help him raise capital for the company.  (Gov't Ex. 23; PSR ¶ 12.)  Defendant drafted a promissory note in her name for a $50,000 loan to Sawtooth, (Gov't Ex. 23), stating that "interest [would be] payable on the unpaid principal at the rate of 9 percent per annum, calculated monthly not in advance."  (Gov't Ex. 23.)  It was to "be repaid in 24 consecutive monthly installments of $375.00 each on the first day of each month[.]"  (Id.)  If Sawtooth failed to repay the principal after 24 months, Defendant personally would receive "10% of the outstanding shares or membership units of Sawtooth Asset Management."  (Id.)  The note did not mention Fund X.  (Cf. id.)

In December 2009, Defendant transferred $50,000 from the TD Ameritrade Fund X to the Wells Fargo Fund X and then wired that money to Sawtooth. (Gov't Ex. 1.) When the first interest payment came due, Defendant sent Pries an e-mail stating, "[t]o avoid wiring fees, do you want to make the monthly interest payment due on the loan via check? The check should be made out to : [sic] Investor's Income Fund X." (Gov't Ex. 24.) Pries responded, "[m]y only concern is that the loan is from Renee Brown (Individual Investor). Want to make sure we are getting credit for paying you on the loan." (Id.) Defendant responded: "I own the INvestor's [sic] Income Fund." (Id.) Sawtooth sent the check in January 2010 to Investor's Income Fund and Defendant deposited it into her personal bank account at USAA. (PSR ¶ 12.)

### F.  Defendant Used Fund X Assets to Finance Aaria Capital

In December 2009, Defendant formed a new wealth management company named Aaria Capital, Inc. and planned to take some of her Wildwood clients with her. (PSR ¶ 16.) That month Defendant signed a lease for office space in downtown Minneapolis for her new company. (Gov't Ex. 14; PSR ¶ 16.) She opened an account at Fidelity Bank ("Fidelity") in Aaria's name and was the only signatory on the account. (Gov't Ex. 25.)

Defendant deposited $6,000 from her USAA checking account to the Aaria account at Fidelity. (Gov't Ex. 25; PSR ¶ 16.)[3] On February 11, 2010, Defendant wired $85,000 into the Aaria account from the Wells Fargo Fund X account. (Gov't Exs. 1,

---

[3]  FBI Special Agent Hovey testified at the evidentiary hearing that during her investigation she determined that the $6,000 that was transferred from Defendant's USAA checking account to the Wells Fargo Fund X account came from Fund X money that Defendant transferred into her USAA account.

25.)  The majority of that money was used to remodel Aaria's new office space, including $30,000 to a general contractor called Rose Creek Builders, $35,000 to Cabinet Concepts and Interiors for furniture and fixtures, and approximately $4,300 to SMD Copy Systems for office equipment.  (Gov't Ex. 25.)[4]  No additional funds were ever placed in the Aaria account.  (Cf. Gov't Ex. 25.)

### G.    Defendant Made Payments to Investors From Fund X

In early October 2009, Fund X paid $2,250 to both H.J. and S.H.  (Gov't Ex. 1.) Up to this point, Fund X had made no investments, thus the money Defendant paid to H.J. and S.H. from Fund X were made from their own deposits into the fund.  (Id.)

In mid-October 2009, Defendant purchased securities consisting of stock for approximately $100,000 with TD Ameritrade.  (Gov't Ex. 1; PSR ¶¶ 11, 17.)  Defendant sold the securities and made approximately $25,000.  (Id.)  Defendant continued to pay investors S.H. and H.J. quarterly "investment returns" and "dividend" payments on a regular basis between October 2009 and March 2010 for a total of approximately $12,000.  (Gov't Ex 1; PSR ¶ 17.)

### H.    Defendant Began Searching for A Condominium

Defendant had been thinking about purchasing a condominium as early as February 2009 when she told her realtor "let's get [me] out of [Golden Valley]."  (Gov't

---

[4]    Defendant maintains that she issued a promissory note for the full amount of the Aaria loans in favor of Fund X.  (PSR ¶ 16.)  When asked at the evidentiary hearing whether Defendant possessed a copy of this promissory note, Defense counsel informed the Court that she did not.  Since Defendant has not produced a copy of the promissory note, it will not be considered by the Court.

Ex. 27.)  In January 2010, Defendant began looking at a condominium in Hopkins, Minnesota.  (Gov't Ex. 32.)  Defendant made an offer in her name on that condominium and never mentioned Fund X during the course of the negotiations.  (Id.)  Financing could not be obtained for the condominium due to pending litigation on the unit so Defendant made a cash offer.  (Gov't Ex. 32; PSR ¶ 13.)  In an effort to demonstrate that she had enough liquid assets to purchase the condominium, Defendant e-mailed her realtor a client's Charles Schwab statement fabricated to make it appear that it was Defendant's account, falsely indicating that Defendant had over $600,000 in her Schwab account.  (Id.)  Defendant's actual Charles Schwab account contained less than $200 in it. (Gov't Ex. 33; PSR ¶ 13.)

Defendant agreed on a cash purchase for the condominium at a price of $575,000. (Gov't Ex. 35; PSR ¶ 14.)  Defendant e-mailed her realtor stating, "Gulp, I'm going to throw up now and then start getting cash.  I need until Feb 26 to close.  My problem is that I'm travelling until Feb 5th and I have to remove some hedges from the stock before it can sell."  (Gov't Ex. 35.)  Defendant then signed the final purchase agreement in her name.  (Gov't Ex. 36; PSR ¶ 14.)  Fund X was never mentioned.  (Cf. id.)

## I.     Defendant Sought Additional Investors For Fund X and Used Those Funds to Purchase the Condominium

Defendant continued to solicit investment from her clients for Fund X and obtained funds from S.H. and four additional investors for a total of $600,000 in February 2010.  (Gov't Ex. 1; PSR ¶ 15.)

### 1.      Defendant sought additional funds from S.H.

Defendant e-mailed S.H. on January 25, 2010, and said, "[a]nother pool of bonds coming up in a week – at 9%.  You still have $100K in fixed income that we should consider moving in to produce better current income."  (Gov't Ex. 15.)  S.H. responded, "9% sounds great!"  (Id.)  On February 9, 2010, Defendant told S.H. "[t]he cut-off date for escrow is February 15th.  The Money will be invested March 1 and the first payment will arrive in April.  Same rate of 9% on a different pool of bonds."  (Gov't Ex. 18.)  Defendant also stated, "[G]iven that the remaining bond portfolios are yielding 3-5%, this makes a tremendous amount of sense.  These private pools are only available as Reg D investments, so not everyone can play."  (Id.)  S.H. agreed to invest additional funds and transferred $200,000 into Fund X on February 10, 2010.  (Gov't Ex. 1.)

### 2.      Defendant sought funds from M.H.'s Trust

Defendant also sought funds from an investor named M.H. by submitting a form to TransAmerica Life Insurance Company ("TransAmerica") requesting a withdrawal of $350,000 from "[M.H.] Irrevocable Trust c/o Wildwood Wealth Mgmt."  (Gov't Ex. 43.)

The day after signing the form, Defendant sent a letter to TransAmerica stating, "[d]ue to financial circumstances, [M.H.] needs these funds sent immediately and [sic] overnight envelope has been enclosed for your use."  (Gov't Ex. 44.)  Any questions were to be addressed to Defendant.  (Id.)  The letter was signed by J.H., who served as trustee

of M.H's trust account.  (Id.)  J.H. has since told the Government that it was not his signature on the letter.[5]

On February 5, 2010, Defendant e-mailed trustee J.H. and stated:

> A check in the amount of $350,000 is being sent to your address in Texas. I need that check sent to me as soon as you receive it, so I can get it invested and started in the payout process to you as the trustee.  I have a fund that will pays [sic] a 9% interest rate, but we need to get the check invested by the 15th of February.  I will try to get the check sent to my office, but if they deny my request I need you to be on the look out for it.

(Gov't Ex. 16.)

On February 10, 2010, Defendant again attempted to withdraw funds from M.H.'s TransAmerica trust by forging a letter from trustee J.H. stating, "[a]s trustee, I want the contract SURRENDERED IN FULL and a check sent to my attention IMMEDIATELY[.]"  (Gov't Ex. 46.)  TransAmerica ultimately transferred $50,000 to the Wells Fargo Fund X account on February 25, 2010 and $300,000 to the Wells Fargo Fund X account on March 3, 2010.  (Gov't Ex. 1.)

### 3.      Defendant sought funds from M.C.

On February 5, 2010, Defendant e-mailed her client, M.K., who was a trustee on an account for her elderly mother, M.C., stating, "I have a three year bond portfolio that pays 8% and am planning on moving [M.C.'s] fixed income allocation into that.  This will provide her with a [sic] interest payment each month of $666."  (Gov't Ex. 17.) Defendant sent a letter to Charles Schwab on February 9, 2010, requesting that it process

---

[5]      FBI Special Agent Ruth Hovey testified at the evidentiary hearing that J.H. told her that it was not his signature on the letter.

a wire transfer authorization for $100,000 to be transferred to Fund X at Wells Fargo for M.C. (Gov't Ex. 45.)  The form appeared to be signed by M.C., but it was later determined by the Government that Defendant signed the form.  (Gov't Ex. 45.)[6]  The funds were transferred to Fund X that day.  (Gov't Ex. 1.)[7]

### 4. Defendant sought funds from J.K.[8]

Defendant also met with a client named J.K. to seek money for Fund X on February 9, 2010.  J.K. remembers signing forms when he met with her that day, but he does not recall the substance of their meeting or discussing Fund X.  After their meeting on February 9, 2010, Defendant sent a letter signed by J.K. to Allianz Life Insurance Company requesting all of J.K's funds from an annuity account be surrendered and transferred into his Charles Schwab brokerage account.  (Gov't Ex. 53.)  There was a

---

[6]     M.C. testified at the evidentiary hearing on June 19, 2012, that it was not her signature on the wire authorization form.

[7]     Charles Schwab account notes dated February 23, 2010, show that after it made the wire transfer from its account to the Wells Fargo Fund X, it called M.C. to ensure that she was aware of the transfer as an "extra level of protection."  (Gov't Ex. 45.)  An account note from a Charles Schwab employee at 3:31:18 P.M. states that M.C. was aware of the transfer of $100,000.  (Id.)  An account note from the same Charles Schwab employee at 3:48:51 PM, however, states that M.C. called back about the transfer and said she believed the wire was only supposed to be for $50,000.  (Gov't Ex. 47.)  M.C. also stated that she understood "that some money was being wired [sic] to Wells Fargo bank account for her benefit for an investment being made."  (Id.)  On March 5, 2010, Charles Schwab terminated the wire after determining that the "client did not authorize" the transfer.  (Id.)

[8]     FBI Special Agent Ruth Hovey testified at the evidentiary hearing on June 19, 2012, regarding Defendant's efforts to obtain funds from victim J.K.

$10,000 surrender charge related to this withdrawal.  J.K. ultimately transferred $200,000 to Fund X.  (Gov't Ex. 1.)

### 5. Defendant sought funds from R.H.

In late February 2010, Defendant met with J.W., a client who works in the financial services industry and serves as a trustee on an account for her father, R.H.  An attorney named R.D. was also present at the meeting.  Defendant told J.W. and R.D. that she was going to invest R.H.'s money in bond funds and e-mailed J.W. stating, "I'm reallocating your Dad's fixed income to a 9% private bond fund. . . .  Escrow closes on Friday."  (Gov't Ex. 19.)  Defendant transferred $50,000 of R.H.'s funds to Fund X, even though no materials regarding Fund X had been provided to J.W., R.H., or R.D.  (Gov't Ex. 1.)  Defendant did not tell J.W., R.H., or R.D. that Fund X would be used to invest in real estate.  (PSR ¶ 36.)

### J. Defendant Closes on the Condominium

On February 26, 2010, Defendant wired $557,042.98 from the Fund X account to Executive Title Trust to purchase the condo in her own name, leaving a balance of approximately $4,775 in the Fund X account.  (Gov't Ex. 1.)  Defendant recorded the title to the condominium in her name.  (Def. Ex. 3.)

After the closing, Defendant moved into the condominium with her daughter. (Gov't Ex. 38.)  An interior decorator named Annie Ballentine came to view the condominium.  (Gov't Ex. 41.)  Ballentine e-mailed Defendant after visiting the condominium and said, "[t]hanks for having me over to your new condo yesterday.  It is truly stunning and although you don't feel it's 'you' yet, we can make some simple

additions that will bring the light feel of your Cloverleaf house to your new home!"  (Id.)
On March 1, 2010, Defendant e-mailed Ballentine again stating, "I'm crying out for help.
The colors in the place simply suck all the energy out of me.  Can you meet me there and
bring paint chips?"  (Gov't Ex. 42.)

Defendant noted several issues with the condominium's board rules to her realtor,
including that "there is an age limit of 18 for using the exercise room unsupervised.
Clearly this [sic] unacceptable as Madeline is 16."  (Gov't Ex. 38.)  She similarly
inquired "[w]ill I be required to have a land line in the unit in order to buzz people in?"
(Id.)  She also questioned the monthly fees for the unit, asking about cable and phone
fees, lawn services, common areas, and miscellaneous maintenance issues.  (Id.)
Defendant also hired contractors to repair structural deficiencies and lived with her
daughter in the condominium until investigation of the instant offense began, when the
condominium was seized by the receivership.  (PSR ¶ 15.)

### K. Charles Schwab Noticed Suspicious Transactions By Defendant and Contacted Wildwood

On March 3, 2010, Defendant wired $300,000 from her client M.H.'s Wildwood
account at Charles Schwab to the Fund X account at Wells Fargo.  (Gov't Exs. 1, 20.)
Defendant also attempted to transfer $50,000 from M.C.'s Charles Schwab to the Fund X
checking account.  (PSR ¶ 18.)  An employee from Charles Schwab contacted M.C. to
inquire about the nature of the transaction because it appeared suspicious.  (Id.)  M.C.'s
daughter reviewed documents related to the transfer and believed that M.C.'s signature
authorizing the transfer had been forged.  (Id.)

Charles Schwab called Wildwood to set up a conference call with the partners and Defendant.  (<u>Id.</u>; Gov't Ex. 20.)  Defendant insisted on taking the conference call alone.  (<u>Id.</u>)  On the call, Defendant indicated that Fund X was a private Reg. D fixed income investment and that she provided subscription agreements to all her clients who had invested in the fund.  (<u>Id.</u>)  Defendant told Charles Schwab staff that she was not the general partner of the fund and she did not know who it was without accessing her records.  (<u>Id.</u>)  Charles Schwab staff requested Defendant "email us copies of the fund's subscription agreement and the name of its General Partner," which Defendant agreed to do.  (<u>Id.</u>)

On March 8, 2010, after the conference call with Charles Schwab, Defendant went to Wells Fargo Bank with one of her partners and Wildwood's attorney to freeze the Fund X checking account.  (PSR ¶ 20.)  They discovered that a wire transfer was pending to transfer an additional $131,000 from the Fund X account to one of the Defendant's clients who had not invested in Fund X. (<u>Id.</u>)  The pending transfer was classified as a loan and was meant to allow the client to purchase a large life insurance policy from an outside broker.  (<u>Id.</u>)  Defendant agreed to cancel it.  (<u>Id.</u>)  Defendant would have received a large commission payment if the sale of the life insurance policy had been completed.  (<u>Id.</u>)  Defendant's Wildwood partners immediately terminated her partnership with the firm and valued her contribution to the firm at $0.  (<u>Id.</u>)  Wildwood reported Defendant's conduct to the U.S. Securities and Exchange Commission ("SEC")

and the Financial Industry Regulatory Authority ("FINRA"), which prompted the commencement of civil and criminal investigations.  (Id.)[9]

### L.    The Investors in Fund X Are Repaid Through Various Sources

Civil records from Hennepin County, Minnesota confirm that a receiver was appointed on May 27, 2010, to distribute the funds recovered from Fund X.  (PSR ¶ 30.) The receiver was able to recover the following amounts: (1) $302,974.70 in cash from the Wells Fargo Fund X account; (2) $50,000 from the Sawtooth promissory note that was purchased by Wildwood; (3) $486,936.13 from the condominium sale after costs; and (4) $486.50 from the TD Ameritrade Fund X account.  (PSR ¶ 30.)  Defendant, the Wildwood partners, and the SEC provided additional reimbursement to the victims. (PSR ¶ 31.)  In November 2011, Defendant's civil counsel sent checks with partial payment to the five investors seeking reimbursement along with letters outlining how the investment and promised interest would be repaid.  (Def. Ex. 4.)

### II.    PROCEDURAL POSTURE

On May 11, 2011, an 11-count Indictment was filed in the District of Minnesota charging Defendant with (1) securities fraud from June 2009 to March 2010, in violation of 15 U.S.C.§ 78j(b) and 78ff (Counts 1 through 5); (2) wire fraud from June 2009 to March 2010, in violation of 18 U.S.C. § 1343 (Counts 6 through 10); and (3)

---

[9]    FBI Special Agent Ruth Hovey testified at the June 25, 2012 evidentiary hearing that Wildwood contacted the SEC and FINRA on March 8, 2012.  After Wildwood had contacted the SEC and FINA, on March 15, 2012, Defendant transferred title to the condominium from herself to Fund X.  (Def. Ex. 3.)

transactional money laundering on February 11, 2010, in violation of 18 U.S.C. § 1957

(Count 11). (Doc. No. 1.)

On February 15, 2012, Defendant appeared before this Court, entered a plea of

guilty to one count of wire fraud (Count 6), and admitted the following facts in the plea

agreement:

> During the relevant time period, defendant was an investment adviser and a
> principal of Wildwood Wealth Management, LLC. On July 1, 2009,
> defendant created Investor's Income Fund X, LLC ("Fund X") as a limited
> liability company under the laws of the State of South Dakota. Defendant
> was the sole managing member and control person of Fund X. Defendant
> also opened and maintained sole control over two accounts in Fund X's
> name: an account at TD Ameritrade, and a checking account at Wells Fargo
> & Company ("Wells Fargo"). After creating Fund X, defendant contacted
> investors by telephone, email, and in person, and encouraged them to invest
> in Fund X. In total, defendant obtained $1,100,000 from investors for Fund
> X by making material misrepresentations or omissions.

> To encourage some investors to invest in Fund X, defendant represented
> that Fund X was a "bond fund" with an 8% or 9% rate of return, and that
> defendant had personally invested $200,000 of her own money in Fund X.
> Yet Fund X did not own bonds, and defendant did not personally invest her
> own money in it. Defendant knew these statements were false when she
> made them and she made them with the intent to obtain money from
> investors.

> Specifically, on June 29, 2009, defendant sent an e-mail to S.H. with
> misleading statements, to include that defendant has personally invested in
> Fund X. Defendant knew these statements were misleading when they
> were made and these statements caused S.H. to invest in Fund X. This e-
> mail was sent in interstate commerce.

(Doc. No. 49.)

The Probation Office circulated a draft PSR for Defendant on March 28, 2012.

Both the Government and Defendant filed numerous factual and legal objections to it on

April 25, 2012. The Probation Office revised the PSR to address the parties' objections

and submitted it to the Court on May 9, 2012. The revised PSR concludes that the appropriate advisory guideline range is 51 to 63 months imprisonment, based on an offense level of 24 and a criminal-history category of I. By statute, the maximum term of imprisonment that can be imposed on the Defendant is 20 years. 18 U.S.C. § 1343.

The Court held evidentiary hearings on June 19 and June 25, 2012, regarding the parties' objections to the PSR. The Government submitted evidence and called FBI Special Agent Ruth Hovey and M.C. to testify. Defendant also introduced documents but did not call any of her own witnesses. The Court now turns to the parties' objections.

## III.  DISCUSSION

Defendant objects to the PSR's inclusion of a 16-level enhancement in ¶ 48 calculating the amount of loss in this case as over $1,000,000. The Government objects to the PSR's failure to include a two-level enhancement in ¶ 49 for use of sophisticated means, a two-level enhancement in ¶ 51 for vulnerable victims, and a two-level enhancement in ¶ 53 for obstruction of justice. The Government also requests that the Court refuse to apply a three-level reduction in ¶ 54 for acceptance of responsibility.

### A.    Amount of Loss

Paragraph 48 of the PSR calculates Defendant's actual and intended loss as an amount in excess of $1,000,000 but less than $2,500,000 qualifying Defendant for a 16 level enhancement. Loss is calculated under the sentencing guidelines as the greater of the intended loss or the actual loss. USSG § 2B1.1 cmt. n.3(A ). "Actual loss means the reasonably foreseeable pecuniary harm that resulted from the offense." Id. § 2B1.1(b)(1) cmt. n.3(A)(i) (quotation omitted). "Intended loss . . . means the pecuniary harm that was

intended to result from the offense . . . [and] includes intended pecuniary harm that would have been impossible or unlikely to occur[.]" Id. § 2B1.1 cmt. n.(3)(A)(ii). "A sentencing court must calculate a reasonable estimate of the loss based upon a preponderance of the evidence." United States v. Hatchett, 622 F.3d 984, 987 (8th Cir. 2010) (citation omitted); see also USSG § 2B1.1 cmt. n.3(C).

Actual loss "normally includes credit for repayments received prior to discovery of the crime," and a sentencing court therefore typically focuses on intended loss when considering "whether to grant credit for repayments." United States v. Hartstein, 500 F.3d 790, 798 (8th Cir. 2007). Courts must characterize "intended loss with reference to a defendant's actual, subjective intent," id. (citations omitted), and "compute the maximum possible loss from the perspective of a reasonable person in the defendant's position at the time of the fraud." United States v. Staples, 410 F.3d 484, 490 (8th Cir. 2005). "[C]ourts do not subtract from the intended loss repayments made by a defendant to his victim after the detection of the offense, as such payments, given their timing, likely do not indicate anything about the defendant's culpability." Id. at 491 (citations omitted).

In this case, the PSR added 16 levels to defendant's offense level under § 2B1.1(b)(1)(I) of the Sentencing Guidelines because loss was calculated to exceed $1,000,000 but to be less than $2,500,000. Defendant argues that although she obtained $1,100,000 from the victims, her victims were repaid in full by the investment returns ($12,000), the purchase price of the condominium ($575,000), the value of the Sawtooth note ($50,000), the cash left in Fund X when it was turned over to the receiver

($304,000), and the money paid by the Wildwood principals, the SEC, and the Defendant. If these amounts were credited against Defendant's loss calculation, there would be a gain to the investors of approximately $179,000.

The Government calculates the amount of loss at $1,100,000—the amount the Defendant admitted that she had obtained from investors for Fund X by making material misrepresentations or omissions in her plea agreement. Since Defendant falsely represented to victims that she would invest the $1,100,000 in fixed income or bond funds that would yield an eight or nine percent rate of return but instead used the money for her own purposes, the Government contends that amount was both her actual and intended loss.

### 1. Investor Returns

Defendant seeks to reduce her loss calculation by the $12,000 in "investor returns" that she gave to two Fund X investors between October 2009 and March 2010. The Government responds that, when calculating the intended loss, any purported "returns" should not be subtracted from Defendant's loss calculation because they were provided to the victims to continue the fraudulent scheme.

Investor returns are not subtracted from an intended loss calculation where they were made to further the fraud. In Hartstein, for example, the defendant was a travel agent who solicited loans from numerous victims, promising to quickly repay their principal and give them free travel benefits. 500 F.3d at 791. Over time, the defendant solicited new loans to pay the principal on old loans or to purchase airline tickets to appease her prior lenders. Id. When determining whether the defendant's loss

calculation should be reduced by amounts repaid to victims, the court focused on the defendant's "subjective intent." Id. at 800. It concluded that where repayment relates only to the "illegal purpose of perpetuating the scheme . . . a sentencing court may refuse to credit repayments against sums received from the victims." Id. at 800; see also Hatchett, 622 F.3d at 988 (the district court properly declined to credit the defendant for repayments because the defendant's "subjective intent in making the repayments was to further his scheme.").

Like in Hartstein, the Defendant here is not entitled to a reduction in the loss amount for the $12,000 in "investment returns" provided to the investors of Fund X because the return of that money was for the "illegal purpose of perpetuating the scheme." 500 F.3d at 800. When Defendant solicited the investors in Fund X she explained to them that "the investment [would] pay a 9% annual coupon with quarterly payments." Defendant admitted in her plea agreement that she made material misrepresentations "with the intent to obtain money from investors." To continue her scheme, Defendant made regular payments in small amounts to S.H. and H.J., the first two investors in Fund X, on the schedule that she had promised. Defendant made quarterly dividend payments of $2,250, for example, to investor S.H. in October 2009 and again in January 2010. Defendant was simultaneously using the money from the investors to pay her personal debt and to make a loan for her personal benefit. Defendant had also started looking at a condominium that she could not afford without investor money. Her small, regular payments to investors avoided potential questions and ensured

her ability to have continued access to the funds.  The $12,000 in "investment returns" was therefore meant to further her scheme and will not be deducted from her loss amount.

### 2.         Condominium and Sawtooth Note

Defendant also seeks a reduction in her loss amount for $575,000, the purchase price of her condominium, and $50,000, the value of the Sawtooth note.  Defendant argues that she purchased the condominium with the intent that it would be an investment property for the benefit of the fund, that she transferred title of the condominium to the fund, that the condominium was transferred to the receiver before the indictment was issued, and that the money from its sale was given to the investors.  Defendant similarly argues that she intended the Sawtooth note to be repaid with interest for the benefit of the investors.  The Government responds that her loss calculation should not be reduced by these amounts because her actions show that she never intended the condominium or the note to be for the benefit of the investors and the investors had no security interest as collateral in either of them.

Courts are instructed under the guidelines and relevant case law to reduce a defendant's loss calculation by pledged collateral in certain instances.  USSG § 2B1.1 cmt. n.3(E)(ii) states that in cases "involving collateral pledged or otherwise provided by the defendant, [the loss amount shall be reduced by] the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing."

The Eighth Circuit has not directly examined whether unsecured or unpledged assets can be collateral for purposes of determining loss under the Sentencing Guidelines, but has suggested that they are not. In United States v. Oligmueller, the defendant fraudulently obtained "a loan [from a bank] that was secured by livestock, feed, and other machinery." 198 F.3d 669, 670 (8th Cir. 1999). When his fraud was discovered, he owed the bank over $890,000. Id. The defendant liquidated his assets of pledged collateral and unpledged assets, and repaid the bank most but not all the amount owed. Id. at 672. In determining his loss calculation, the defendant was only entitled to credit for the money he had repaid to the bank from the sale of pledged assets. Id. at 671.

Other circuits have held that the Sentencing Guidelines limit collateral to secured or pledged assets. In United States v. Dullum, the defendant sought a reduction in his loss amount because "he had other funds in his bank accounts to offset the bad check." 560 F.3d 133, 139 (3d Cir. 2009). The court stated, "[b]ased on a common sense reading of [USSG § 2B1.1 cmt. n.3(E)(ii)'s] straightforward language . . . we believe the correct interpretation limits its application to situations involving a traditional notion of collateral, such as fraudulently inducing a bank to issue a secured loan." Id. The loss amount there was not reduced because the "bank accounts were not formally pledged as collateral." Id. The Fifth Circuit also found that allowing "the pledge of collateral after discovery of the offense would be totally at odds with . . . the long-standing, well-recognized rule that post-detection repayments or pledges of collateral do not reduce the loss." United States v. Austin, 479 F.3d 363, 369 (5th Cir. 2007). That is because the

"the Guidelines do not permit defendants to buy a sentence reduction after being caught."
Id. at 370 (citations and quotation omitted).

As in Oligmueller and Dullum, the Defendant here is not entitled to a reduction of
her loss calculation under USSG § 2B1.1 cmt. n.3(E)(ii) because the condominium and
the Sawtooth Note were not pledged to the victims' benefit prior to the discovery of the
fraud. As in those cases, it would be improper to credit Defendant for the value of the
condominium or the note because that would permit her to "buy a sentence reduction"
after being caught. Crediting the Defendant here would amount to differentiating
"criminal defendants on the basis of their economic resources, which is clearly contrary
to the intent of the sentencing guidelines." United States v. Carlson, 498 F.3d 761, 766
n.4 (8th Cir. 2007) (citation omitted). The victims never had a security interest or lien in
these assets even though the Defendant purchased these assets with money from Fund X.
The Court therefore determines that the condominium and Sawtooth note are not credited
against Defendant's loss amount because they are not "collateral" as that term is defined
under the Sentencing Guidelines.

Even if the Court were to determine that the condominium and Sawtooth note
could constitute collateral under USSG § 2B1.1 cmt. n.3(E)(ii), that would not change the
Defendant's loss calculation. The court in United States v. Staples, further clarified that
collateral should only be considered "when determining the intended loss amounts . . .
[i]f a reasonable person intended for the collateral to revert to the defrauded party (or
understands that it will)." 410 F.3d 484, 490 (8th Cir. 2005). There, a bank gave a
mortgage to the defendant after he had given a title company a fake check to purchase the

home.  Id. at 489.  When the defendant's conduct was discovered, the bank foreclosed on the house and sold it for less than the defendant owed.  Id.  The court concluded that the intended loss calculation should include a deduction for the amount of the mortgage outstanding after the home had been sold at a foreclosure, but it cautioned that it did not "mean that the value of the collateral necessarily must be deducted from the intended loss; the defendant's intent is the touchstone."  Id. at 490.

Unlike in Staples, no evidence here suggests that Defendant reasonably intended for the condominium to revert to the investors.  Defendant solicited funds from her clients to purchase the condominium, but told them that she would invest the money in a bond or fixed income fund.  She then signed the condominium purchase agreement and registered the title in her own name.  The condominium was not pledged as collateral to the investors of Fund X, and the investors had no lien on it.  Defendant sent multiple e-mails to her realtor and decorator evidencing that she intended to use the condominium as her personal residence and did not mention the possibility that the condominium would be an investment property.  Only investor S.H. was informed after she had already invested in the Fund that Defendant had used Fund money to purchase a condominium. Defendant's conduct was wholly inconsistent with an intent for the condominium to revert to the investors.

Defendant's ultimate transfer of the title of the condominium to Fund X does not alter this conclusion because that transfer did not occur until after her fraud had been discovered.  Since she never placed the condominium in the name of the investors nor did she give them a lien on the property, there is no "indica[tion] that the defendant intended

26

to cause a smaller loss than would have occurred absent the collateral." Staples, 410 F.3d at 491. She hid from the investors the fact that their investment money was going to fund her cash purchase of a condominium for her personal use and the investors were not informed of this arrangement or given the opportunity to control the disposition of the condominium until after the fraud was discovered. See id. (collateral is not to be deducted from the loss calculation where its existence has been hidden by the defendant); see also United States v. Keiser, 578 F.3d 897, 906 (8th Cir. 2009) (loss calculation included the entire amount where defendant solicited funds from the victims for the purported investment).

Similarly, no evidence demonstrates that Defendant intended for the Sawtooth note to benefit the investors. Defendant drafted the note in her name and the agreement provided that if Sawtooth should default, Defendant would receive an ownership percentage of Sawtooth. The promissory note did not mention Fund X. While Defendant requested that Sawtooth send its first interest payment made out to "Investor's Income Fund X," Defendant ultimately deposited that check into her personal banking account. Defendant failed to inform investors that she planned to use their money to invest in Sawtooth and the investors were given no security interest in the note should Sawtooth default. As such, Defendant intended to use the Sawtooth note for her benefit. Accordingly, the Court determines that the PSR properly included the purchase price of the condominium and the value of the note as part of Defendant's loss amount.

### 3.        Money Remaining in Fund X

Defendant further seeks a reduction in her loss amount for $304,000, the cash remaining in Fund X when the Defendant turned over Fund X to the receiver.  Defendant argues that she intended to return this money to the investors and that she fully cooperated with the receiver to distribute these funds to the investors.  The Government responds that it would be improper to reduce her loss calculation by this amount because her actions demonstrate that she did not intend to return this money to the investors.

The Eighth Circuit held in Staples that "courts do not subtract from the intended loss repayments made by a defendant to his victim after the detection of the offense, as such payments, given their timing, likely do not indicate anything about the defendant's culpability."  Staples, 410 F.3d at 491.  Given that Defendant did not pay the remaining funds in Fund X to the investors until after the fraud was detected, the Defendant is not entitled to a reduction of the loss amount for this amount.

Moreover, there is no indication that Defendant intended to return the money remaining in Fund X to the victims.  Defendant had used Fund X assets for her personal needs and when Defendant went to Wells Fargo with one of her Wildwood partners to freeze the Fund X assets, a wire transfer was pending to distribute an additional $131,000 from Fund X to one of the Defendant's clients—who had not invested in Fund X.  This transaction would have resulted in the purchase of a large life insurance policy and a large commission to Defendant.  The evidence therefore demonstrates that Defendant intended to continue to use Fund X for her personal benefit.  Accordingly, the PSR

properly included the money remaining in the Fund X account as part of the Defendant's loss amount.[10]

## B.    Sophisticated Means

Paragraph 49 of the PSR declines to give Defendant a two-level enhancement for an offense that involved sophisticated means.  Under the sophisticated-means enhancement, a defendant's base offense level may be increased by two levels if "the offense otherwise involved sophisticated means."  USSG § 2B1.1(b)(10)(C).  The Sentencing Guidelines define "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  USSG § 2B1.1(b)(10)(C) cmt. n.8(B).  This enhancement is appropriate when the offense conduct, viewed as a whole, "was notably more intricate than that of the garden-variety [offense]."  United States v. Hance, 501 F.3d 900, 909 (8th Cir. 2007).  "Even if any single step is not complicated, repetitive and coordinated conduct can amount to a sophisticated scheme."  United States v. Fiorito, 640 F.3d 338, 351 (8th Cir. 2011) (citation omitted).  "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts . . . ordinarily indicates sophisticated means."  USSG § 2B1.1, cmt. n.8(B).

---

[10]    For the same reasons, payments made by the Defendant, Wildwood, and the SEC after her fraud was reported to the Government do not qualify for a reduction in the calculation of Defendant's loss amount.

The Government argues that the Court should apply the sophisticated-means enhancement because Defendant created a South Dakota LLC, opened separate bank accounts at two banks, solicited funds from victims in at least four states, and forged documents to orchestrate a fraudulent scheme. Defendant responds that the sophisticated-means enhancement does not apply because she did not employ sophisticated means in this fraud. Defendant asserts that her fraudulent scheme only lasted eight months and she placed investors' funds in readily identifiable accounts at Wells Fargo and TD Ameritrade.

The sophisticated-means enhancement should not be applied in this case. Defendant did not create fictitious entities, corporate shells, or offshore financial accounts for Fund X assets, but rather opened readily identifiable accounts at local banks. Cf. United States v. Anderson, 349 F.3d 568, 571 (8th Cir. 2003) (sophisticated-means enhancement applies when the defendant told victims he would invest their funds with a company that was "organized under the laws of Anguilla, that its principal place of business was in London, England, and that the bonds would mature in four years and were guaranteed by . . . a Swiss bank chartered in Grenada, West Indies."). Additionally, Defendant's fraud was easily detectable by authorities eight months after it began. Cf. United States v. Bistrup, 449 F.3d 873, 883 (8th Cir. 2006) (sophisticated-means enhancement appropriate given "the coordination and planning needed to maintain the scheme for almost five years"). Accordingly, the PSR properly did not apply a two-level enhancement for sophisticated means.

### C.    Vulnerable Victims

Paragraph 51 of the PSR declines to give Defendant a two-level enhancement for an offense that targeted vulnerable victims.  The vulnerable victim enhancement is only available where "the defendant knew or should have known that a victim of the offense was a vulnerable victim."  USSG § 3A1.1(b)(1).  The principal inquiry is whether "the defendant's choice of victims show[s] the extra measure of criminal depravity which section 3A1.1 intends to punish more severely."  United States v. Anderson, 349 F.3d 568, 572 (8th Cir. 2003) (quotation and citation omitted).  The enhancement requires "a fact-based explanation of why advanced age or some other characteristic made one or more victims 'unusually vulnerable' to the offense conduct, and why the defendant knew or should have known of this unusual vulnerability."  Id. (citation omitted).  The enhancement may apply even if the defendant targets "only one unusually vulnerable victim."  United States v. Anderson, 440 F.3d 1013, 1017 (8th Cir. 2006).  Since older persons are often more experienced investors, "it would be clear error to impose a § 3A1.1(b)(1) increase simply because some of the victims of a widespread investment scam were elderly."  Anderson, 349 F.3d at 572.

The Government argues that the vulnerable victim enhancement applies because Defendant's victims included elderly individuals as well as a victim who had all his money in a particular trust controlled by the bank.  Defendant argues that the enhancement is inapplicable because she did not target elderly or financially unstable clients.  Rather, Defendant's fraud was targeted at her clients and friends regardless of their age or financial acumen, including a former securities lawyer, a veterinarian, and an

individual who works in the financial services industry.  Defendant also argues that the elderly victims that were defrauded in this case had sophisticated individuals monitoring their investments.

The vulnerable victim enhancement does not apply in this case.  The Government has failed to show that Defendant orchestrated her fraud with the intent to target elderly or financially unstable investors.  The evidence only establishes that Defendant targeted her clients and friends because of their relationship with her, not because they were particularly vulnerable.  Cf. Fiorito, 640 F.3d at 351 (applying the vulnerable victim enhancement where the defendant's assistant testified that he was targeting "vulnerable, poor, dumb people so that they wouldn't be able to catch on to our scheme.").  Moreover, the Court recognizes that the victims included sophisticated individuals, including a former securities attorney and an individual who works in the financial services industry.  Accordingly, the PSR properly did not apply a two-level enhancement for a vulnerable victim.

### D.    Obstruction of Justice

Paragraph 53 of the PSR does not give Defendant a two-level enhancement for obstruction of justice even though the Government sought that enhancement.  The obstruction of justice enhancement applies when the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction."  USSG § 3C1.1.  "A district court may apply the enhancement for obstruction of justice only if it

finds by a preponderance of the evidence the defendant engaged in the relevant conduct." United States v. Smith, 665 F.3d 951, 955 (8th Cir. 2011).

The PSR correctly determined that Defendant does not deserve a two-level enhancement for obstruction of justice. FBI Special Agent Hovey testified at the evidentiary hearing that Defendant cooperated with Wildwood to freeze the Wells Fargo Fund X account after her fraud was detected. Special Agent Hovey also testified that Defendant cooperated in having a receiver appointed to liquidate the assets of Fund X. There is no indication that Defendant obstructed justice during the investigation, prosecution, or sentencing of this offense and therefore the Court determines that the PSR properly declined to give Defendant a two-level enhancement for obstruction of justice.

## E.    Acceptance of Responsibility

Paragraph 54 of the PSR gives Defendant a three-level reduction for acceptance of responsibility. Under USSG § 3E1.1(a) a sentence is decreased two levels if the defendant clearly demonstrates acceptance of responsibility and an additional one-level reduction is available if the defendant gives timely notice of her intent to plead guilty. Id. § 3E1.1(b). A defendant acts inconsistently with the acceptance of responsibility when he "falsely denies . . . relevant conduct" determined by the court to be true. Id. § 3E1.1 n.1(A). "Whether the defendant accepted responsibility is a factual question that depends largely on credibility assessments made by the sentencing court." United States v. Ayala, 610 F.3d 1035, 1036 (8th Cir. 2010) (quotation and citation omitted).

The PSR properly credited Defendant for acceptance of responsibility. She entered into a plea agreement with the Government on February 15, 2012 where she

admitted to obtaining "$1,100,000 from investors for Fund X by making material misrepresentations or omissions." Defendant admitted that she encouraged victims to invest in Fund X by making false statements that she "knew . . . were false when she made them and made them with the intent to obtain money from investors." Even though she contested her loss amount for the purposes of her sentencing, that is not inconsistent with acceptance of responsibility for the underlying unlawful conduct. Accordingly, the PSR properly included a three-point reduction for acceptance of responsibility.

## IV.    ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT **IS HEREBY ORDERED** that:

1. Defendant's objection to the PSR's calculation of her loss amount is **OVERRULED**.

2. The Government's objection to the PSR for failure to include a two-level enhancement for sophisticated means under USSG § 2B1.1(b) is **OVERRULED**.

3. The Government's objection to the PSR for failure to include a two-level enhancement for vulnerable victims under USSG § 3A1.1(b) is **OVERRULED**.

4. The Government's objection to the PSR for failure to include a two-level enhancement for obstruction of justice under USSG §3C1.1 is **OVERRULED**.

5. The Government's objection to the PSR for including a three-level reduction for acceptance of responsibility under USSG § 3E1.1 is **OVERRULED**.

6. The Court finds, by a preponderance of the evidence, that the total amount of loss in this case is at least $1,100,000 but does not exceed $2,500,000, which yields a 16-level enhancement.

Dated:   July 3, 2012

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge